[Cite as *State v. Frost*, 2021-Ohio-457.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                            Court of Appeals No. S-19-040

    Appellee                                          Trial Court No. 18 CR 847

v.

John J. Frost                                           **DECISION AND JUDGMENT**

    Appellant                                        Decided:  February 19, 2021

* * * * *

Beth A. Tischler, Sandusky County Prosecuting Attorney, and
Alexis M. Hotz, Assistant Prosecuting Attorney, for appellee.

Sarah R. Anjum, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} Appellant, John J. Frost, appeals the September 10, 2019 judgment of the
Sandusky County Court of Common Pleas which, after a jury found him guilty of
involuntary manslaughter with a firearm specification and having a weapon while under
disability, sentenced appellant to an aggregate prison term of 84 months.  For the reasons
that follow, we affirm the judgment.

## II. Facts and Procedural Background

{¶ 2} On July 28, 2018, appellant shot and killed Curtis Gibbs outside his apartment door. At the time of the shooting, Gibbs and his girlfriend, Kelly Ahrens, were unwelcome visitors at appellant's home. Appellant was a recovering addict and Gibbs and Ahrens were part of his old life, before he began his almost two-year treatment for opioid addiction. Both appellant and Gibbs were armed the night of the shooting, and appellant claimed he shot Gibbs in self-defense.

{¶ 3} Police responded to the scene, took appellant into custody, and secured the firearms. The next day, appellant submitted to a drug test and tested negative for drugs, including Suboxone, which was prescribed as part of his treatment. Police searched appellant's home pursuant to a warrant and recovered Suboxone strips, a leafy substance believed to be marijuana, pills, rolling papers, syringes, pipes, and other drug paraphernalia. Appellant was charged and arraigned on one count of murder in violation of R.C. 2903.02(A), an unclassified felony with an attendant firearm specification; one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree with an attendant firearm specification; and one count of having weapons while under disability in violation of R.C. 2923.13(A)(4), a felony of the third degree.

{¶ 4} The matter proceeded to a jury trial on July 15-19, 2019. The state presented testimony by Ahrens, as well as responding police officers and investigators, the coroner, and Dr. Max Pavlock, who was treating appellant for opioid dependency and had prescribed the Suboxone found in the apartment. Appellant presented testimony of a

2.

neighbor and a friend, who both heard gunfire from inside the apartment across the hall, and testified regarding what they witnessed immediately after the shooting.

{¶ 5} Ahrens testified she and Gibbs had stopped to see appellant at his second-story apartment the day before, which was her birthday. On the 28th, Ahrens and Gibbs returned to appellant's apartment to use his bathroom and charge their phones. She also testified that she and Gibbs hoped appellant would want to get drugs so they could take a cut, indicating the three had used heroin together over a year and one-half to two years prior to the date of the shooting. Ahrens testified that appellant answered his apartment door that day holding his handgun, let them in, and when Ahrens came out of the bathroom, she saw appellant aiming the gun's laser sight around the apartment. She witnessed appellant briefly aim the laser sight at Gibbs' chest. After she and Gibbs were in the apartment about 15 minutes, appellant angrily told them to leave.

{¶ 6} In response to appellant's request to leave, Ahrens testified that she and Gibbs walked out, but Gibbs stayed at the top of the stairs as she started down. Ahrens saw Gibbs holding a phone in one hand and a charger in the other. She testified that appellant followed the two out of his apartment, his gun in a grocery bag. Appellant stopped to lock his door, and she heard Gibbs tell appellant that if he was going to point a gun at him, he had better use it, because he had a gun too. Ahrens testified that appellant responded to Gibbs by saying "oh, yeah, mother fucker, if you ain't got the balls to do it, I do." Then Ahrens heard gunfire.

3.

{¶ 7} Officer Seth Strecker was the first to respond to the scene. He testified that upon arriving at the apartment building, he observed Gibbs lying face down at the bottom of the stairs, with Ahrens cradling his head. Gibbs was unresponsive, with blood on his face. Appellant was at the top of the stairs, and advised Officer Strecker that he shot Gibbs. Appellant complied with the order to keep his distance from the firearm at the top of the stairs and remained in Officer Strecker's sight while the officer attempted to preserve the scene and waited for additional law enforcement to arrive.

{¶ 8} Sergeant Marc Linder[1] arrived soon after, and assisted Officer Strecker in securing the scene. He, too, observed Gibbs lying face down, with Ahrens holding his head. Sergeant Linder was the investigating officer, and he contacted dispatch to send additional officers to take statements from people in the building and requested assistance from the Bureau of Criminal Investigation (BCI). Sergeant Linder moved Gibbs from the stairs to the floor, and approached appellant at the top of the stairs. He later interviewed both appellant and Ahrens, and the prosecution played a recording of appellant's statements to Sergeant Linder. Appellant acknowledge an exchange with Gibbs in the hallway. Gibbs told appellant he would kill appellant if he ever pointed his gun at him, to which appellant replied, "what if I point it at you first?"

{¶ 9} Agent Timothy Woolf testified regarding the search of appellant's home. He served on the Drug Task Force, and provided assistance in the hours after the

---

[1] By the time of trial, Sergeant Linder had been promoted to Chief of Police for the city of Bellevue.

shooting. He described the items he seized from appellant's apartment, including the guns belonging to appellant and Gibbs and additional ammunition inside the apartment. Agent Woolf also seized items from a night stand, next to the bed, including a substance that appeared to be marijuana, rolling papers and a grinder, various pills, syringes, and burnt roaches. He seized additional syringes from two other locations in the apartment, and also seized crack pipes and a push rod, wrapped in a yellow cloth, from a closet shelf, and two more crack pipes from the bedroom closet.

{¶ 10} BCI Agent David Horn testified regarding his investigation of the crime scene. He took photographs and noted the locations of cartridge casings, indicating two weapons and providing probable locations for each shooter, based on two sets of shell casings and the positioning of those casings. According to Agent Horn, appellant's firearm shot toward the stairs and downward, and Gibbs' firearm shot toward appellant's door, near where appellant could have been standing as he locked the door. Agent Horn testified that Gibbs' firearm had been disabled, with the possibility a bullet from appellant's gun struck Gibbs' firearm.

{¶ 11} Dr. Cynthia Beisser, M.D., a forensic pathologist, testified regarding the cause and manner of death. Dr. Beisser conducted the autopsy of Gibbs, and testified that he had seven entrance and three graze-type gunshot wounds. Gibbs' entrance wounds were described by Dr. Beisser as: (1) a head wound caused by a bullet entering on the left and exiting on the right, angled downward; (2) a chest wound, entering left and exiting right, almost horizontal; (3) an abdominal wound, entering the right side and

5.

exiting around the right flank, angled downward; (4) a wound to the left flank, angled downward and forward; (5) a wound to the left back, angled downward and forward; (6) a wound to the left arm, entering through the elbow joint; and (7) a wound to the left wrist, entering left and exiting right, with a downward and forward trajectory. Dr. Beisser indicated more than one of the entrance wounds could have been fatal. She also noted that Gibbs had Methamphetamine toxicity, indicating he had used the drug close in time to his death. Dr. Beisser determined the cause of death as multiple gunshot wounds, the manner of death as homicide.

{¶ 12} Dr. Max Pavlock testified regarding appellant's treatment, indicating appellant kept his appointments, took his Suboxone as directed, and submitted to drug screens, both scheduled and random. While appellant occasionally tested positive for marijuana use, this did not concern Dr. Pavlock, as he considered the marijuana use negligible and considered marijuana something less than illegal, based on legalization efforts and medicinal uses for the drug. When confronted with appellant's possession of drug paraphernalia, however, he revised his opinion, and testified that he believed appellant was in danger of becoming drug dependent, despite his otherwise successful treatment for opioid addiction.

{¶ 13} After the close of the prosecution's case, appellant moved for acquittal, which the trial court denied. Appellant presented two witnesses, his neighbor across the hall and her boyfriend. The two neighbors, who were friends of appellant, were in their apartment at the time of the shooting. Each testified they first heard two, more distant

6.

popping sounds, presumed to be Gibbs' gun, followed by louder, closer-sounding gunfire, presumed to be appellant's gun, because after the gunfire stopped, the couple opened the apartment door and saw appellant standing just outside.

{¶ 14} The trial court charged the jury, and included a self-defense instruction that explained both "duty to retreat" and "no duty to retreat." The jury found appellant not guilty on the murder charge, but guilty as to involuntary manslaughter and having weapons while under disability. The jury also made the additional finding as to the firearm specification, attached to the involuntary manslaughter charge. The trial court sentenced appellant to 48 months in prison as to the involuntary manslaughter offense, an additional 36 months for the firearms specification, and 36 months for the having weapons while under disability offense. The firearm specification was ordered consecutive to the involuntary manslaughter sentence, but concurrent to the sentence for having weapons while under disability, for an aggregate prison term of 84 months.

{¶ 15} Appellant filed a timely appeal of this judgment.

### III. Assignments of Error

{¶ 16} Appellant mainly challenges the evidence of drug dependency in support of his conviction for having weapons while under disability and the jury instructions related to his claim of self-defense, asserting the following as error:

I. The evidence presented at trial was insufficient to support a conviction for [having] weapons [while] under disability.

II.  The evidence presented at trial in support of the [having] weapons [while] under disability charge is against the manifest weight of the evidence.

III.  The trial court erred in instructing the jury on both "Duty to Retreat" and "No Duty to Retreat"

IV.  Counsel was ineffective for failing to timely object to the erroneous jury instructions.

## IV.  Analysis

{¶ 17} We address the assigned errors according to the issues raised by appellant.

### A.  Danger of Drug Dependency

{¶ 18} In his first and second assignments of error, appellant argues a lack of evidence of drug dependency or danger of drug dependency.  R.C. 2923.13(A)(4) prohibits possession or use of a firearm by a person who is "drug dependent" or "in danger of drug dependence."  The parties appear to acknowledge that appellant was in treatment at the time of the shooting, and therefore, not drug dependent as that term is defined by law.

{¶ 19} A "drug dependent person" is "any person who, by reason of the use of any drug of abuse, is physically, psychologically, or physically and psychologically dependent upon the use of such drug, to the detriment of the person's health or welfare." A "person in danger of becoming a drug dependent person" is "any person who, by reason of the person's habitual or incontinent use of any drug of abuse, is in imminent

danger of becoming a drug dependent person." *See* R.C. 3719.011(B) and (C); R.C. 2925.01(B). The statute does not include, within its definitions of drug dependency, recovering addicts who no longer abuse drugs. *State v. Wheatley*, 2018-Ohio-464, 94 N.E.3d 578, ¶ 22 (4th Dist.).

{¶ 20} Appellant challenges both the sufficiency and the weight of the evidence as to the danger of drug dependency.

### 1. Sufficiency

{¶ 21} "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1433 (6 Ed.1990). Sufficiency refers to the adequacy of the evidence. *Thompkins* at 386.

{¶ 22} In reviewing for sufficiency, we construe the evidence in the prosecution's favor and consider whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We neither weigh the evidence nor consider the credibility of the witnesses in considering sufficiency. *See, e.g., State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79 ("an evaluation of the witnesses'

9.

credibility, which—as we have repeatedly pointed out—is not proper on review for evidentiary sufficiency.").

{¶ 23} At trial, Dr. Pavlock first testified that appellant was neither drug dependent nor in danger of drug dependency, based solely on his treatment history. He indicated appellant sought help for his opioid addiction voluntarily, and had been treating for about two years. Dr. Pavlock acknowledged some positive drug tests, but did not consider appellant's positive tests for marijuana use problematic, further noting that appellant was maintaining his employment, keeping his doctor appointments, and complying with treatment requirements. Dr. Pavlock stated he had no concerns regarding appellant, "[b]ecause following all of the drug screens and the appointments that I had with [appellant], I seen no reason for concern with him of slipping back into dependence at the time."

{¶ 24} However, when presented with additional information regarding drug paraphernalia and possible drugs in appellant's home, Dr. Pavlock revised his opinion.

Q: [I]f you have a patient you've been treating for two years, they have multiple positive screens for marijuana, they have a positive screen for Amphetamine, that patient has crack pipes, syringes and bags of leafy green vegetation smelling like marijuana in his home, would you say, as a licensed doctor in Ohio with a Board certification, that that individual is not in danger of being drug dependent?

A: They are in danger, yes.

10.

{¶ 25} In order to satisfy sufficiency requirements, the state needed to present evidence demonstrating appellant was in danger of becoming drug dependent. Here, the state presented Dr. Pavlock's testimony, along with evidence of failed drug tests and drug paraphernalia in appellant's home. Expert testimony may be considered for purposes of determining whether a defendant falls within the disability of R.C. 2923.13(A)(4), with the trier of fact ultimately deciding the issue. *State v. Tomlin*, 63 Ohio St.3d 724, 727, 590 N.E.2d 1253 (1992) (permitting expert testimony to assist the jury in determining whether a defendant is a "chronic alcoholic" for purpose of R.C. 2923.13(A)(4)).

{¶ 26} Construing the record most favorably for the prosecution, the state presented evidence of continued, illicit drug use, despite appellant's lengthy treatment with Dr. Pavlock, and Dr. Pavlock's expert opinion that appellant was in danger of becoming drug dependent. Therefore, there was sufficient evidence to support a finding that appellant was in danger of becoming drug dependent, and appellant's first assignment of error is not well-taken.

## 2. Manifest Weight

{¶ 27} Appellant next argues that the conviction is not supported by the manifest weight of the evidence regarding a danger of drug dependency. Manifest weight, in contrast to sufficiency, "concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Black's at 1594.

**{¶ 28}** In considering whether the weight of the evidence supports a finding that appellant was in danger of drug dependence, we review the record, weigh the evidence and all reasonable inferences, and consider the credibility of the testimony, sitting as "a 'thirteenth juror'" that reviews the factfinder's resolution of the conflicting testimony. We reverse a judgment only if we determine that the trier of fact lost its way in resolving conflicts in the evidence. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal, moreover, is reserved for the exceptional case, to prevent a manifest miscarriage of justice. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct.2211, 72 L.Ed.2d 542 (1928); *Martin* at 175.

**{¶ 29}** At issue in this case was whether the evidence demonstrated appellant was in danger of becoming drug dependent, based on "habitual or incontinent use of any drug of abuse." Dr. Pavlock, whose expertise lies in treating drug dependency, considered the drug paraphernalia found in appellant's home, along with appellant's past history of positive drug screens, and despite appellant's progress with his treatment, Dr. Pavlock testified that he believed appellant was in danger of drug dependency. In contrast, appellant presented testimony demonstrating his progress in treatment, and argued the drug paraphernalia was merely left over from his previous life, before treatment.

**{¶ 30}** Upon review of the record, we do not find that this is the exceptional case, requiring reversal to correct a manifest injustice because the jury clearly lost its way. Although there was conflicting evidence, the testimony and evidence reasonably demonstrated that appellant continued to use and/or abuse illicit drugs, and therefore was

12.

in danger of drug dependency. Based on the evidence, we do not find the jury lost its way in resolving conflicts in the testimony. Accordingly, we find no merit to appellant's second assignment of error, challenging the weight of the evidence.

## B. Self-Defense

{¶ 31} In his third and fourth assignments of error, appellant argues error relative to the jury instruction on self-defense. Pursuant to R.C. 2901.05, a self-defense instruction is required if "there is evidence presented that tends to support that the accused person used the force in self-defense." Appellant argues that the trial court incorrectly instructed the jury as to both a "duty to retreat" and "no duty to retreat," and his trial counsel was ineffective in failing to object to this instruction.

## 1. Duty to Retreat

{¶ 32} Under the current version of R.C. 2901.05, the prosecution has the burden to prove, by a preponderance of the evidence, that appellant did not act in self-defense in using deadly force against Gibbs. *See State v. Smith*, 6th Dist. Wood No. WD-19-070, 2020-Ohio-5119, ¶ 32 ("amended R.C. 2901.05 applies, prospectively, to all trials that are held after the effective date of the statute."). To claim self-defense as an affirmative defense, the claimant must not be at fault in creating the situation, the claimant must have a genuine belief that he or she is in imminent danger of death or great bodily harm with no other means of escape, and the claimant must not violate a duty to retreat or avoid danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). There are exceptions to the duty to retreat, however, such as where the person acting in self-defense

13.

is in their own home, or retreat is not possible. *See State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997); R.C. 2901.09(B).

{¶ 33} The trial court provided the following jury instruction regarding self-defense:

> Now, in this case we have an affirmative defense of self-defense. The Defendant is allowed to use deadly force in self-defense. Evidence was presented that may support a finding that the Defendant used deadly force in his self-defense. The State has the burden of proving beyond a reasonable doubt that the Defendant did not justifiably use deadly force in his self-defense.
>
> Self-defense means that * * * the Defendant was not at fault in creating the situation giving rise to the shooting which occurred on July 29, 2018 at 113 Thomas Drive, Bellevue; and the Defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm; and the Defendant did not violate any duty to retreat to avoid the danger; and the Defendant used reasonable force.
>
> * * *
>
> Now, Duty to Retreat. The Defendant had a duty to retreat if he, (A), was at fault in creating the situation giving rise to the shooting; (B) he did not have reasonable grounds to believe and an honest belief that he was

14.

in imminent or immediate danger of death or great bodily harm; or, (C), that he had a reasonable – or that he had a reasonable means of escape from that danger other than by the use of deadly force.

Now, No Duty to Retreat. The Defendant did not have a duty to retreat if, (1) he reasonably indicated his intention to retreat or escape from the situation and no longer participate in it; (2) he then had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm; and (3) the only reasonable means of escape from that danger was by the use of deadly force, even though he was mistaken as to the existence of that danger.

{¶ 34} We review a trial court's decision regarding jury instructions for an abuse of discretion. (Citation omitted.) *State v. White,* 988 N.E.2d 595, 2013-Ohio-51, ¶ 97 (6th Dist.). The trial court should include "all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *White* at ¶ 97, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

{¶ 35} Appellant argues that the "duty to retreat" and "no duty to retreat" instructions, when given together, created confusion because a jury could find that appellant had both a duty to retreat and no duty to retreat, based on application of the law as provided by the trial court. We disagree. The jury instructions echoed the common law regarding self-defense, requiring retreat in most circumstances unless retreat was not

possible and the use of force unavoidable. *Thomas*, 77 Ohio St.3d at 326, 673 N.E.2d 1339.

{¶ 36} Here, the jury considered the evidence, including appellant's anger, appellant's brandishing of his handgun, the confrontational exchange outside the apartment door between appellant and Gibbs, and the exchange of gunfire that appeared to flow from that confrontation. In considering the evidence, the jury was tasked with applying the law, which first required considering the elements for a self-defense claim.

{¶ 37} "[T]he elements of self-defense are cumulative." *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). Therefore, if the jury determined that appellant was "at fault in creating the situation giving rise to the affray," appellant had a duty to retreat. *Id.* at 283. That duty to retreat continued unless appellant attempted to withdraw from the conflict but found his only means of escape was the use of force. *Id.* at 284. The trial court, therefore, appropriately instructed the jury according to the applicable law, and we find no abuse of discretion. Appellant's third assignment of error, accordingly, is not well-taken.

### 2. Ineffective Assistance

{¶ 38} In his fourth and final assignment of error, appellant argues his trial counsel was ineffective in failing to object to the "erroneous" jury instruction regarding self-defense. To prevail on a claim for ineffective assistance of counsel, appellant must first demonstrate that his trial counsel's performance was deficient. *See State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph two of the syllabus. As we found

16.

no error in the trial court's jury instruction regarding a duty to retreat, we find no deficiency by trial counsel in this regard. Appellant's fourth assignment of error, therefore, is without merit.

## V. Conclusion

{¶ 39} Having found substantial justice has been done, we affirm the September 10, 2019, judgment of the Sandusky County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.