[Cite as *State v. Brown*, 2021-Ohio-1674.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                           Court of Appeals No. L-20-1052

        Appellee                   Trial Court No. CR0201901504

v.

Christopher Brown                **DECISION AND JUDGMENT**

        Appellant                 Decided: May 14, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, P.J.**

## I. Introduction

{¶ 1} Appellant, Christopher Brown, appeals the judgment of the Lucas County Court of Common Pleas, imposing sentences of ten years to life on each of two counts of rape and ten years on each of two further counts of rape, all to be served consecutively, for a total prison sentence of 40 years to life, after a jury found him guilty of the aforementioned offenses. Finding no error in the proceedings below, we affirm.

## A.  Facts and Procedural Background

{¶ 2} On March 21, 2019, appellant was indicted on four counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree, two counts of rape in violation of R.C. 2907.02(A)(2) and (B), felonies of the first degree, and one count of corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a), a felony of the second degree.  According to the indictment, the incidents of rape giving rise to the four charges under R.C. 2907.02(A)(1)(b) occurred during a period of time spanning October 1, 2013 through January 16, 2016, during which A.K., the victim of the rapes and appellant's stepdaughter, was less than 13 years of age.  The remaining rape counts and the corrupting count were premised upon conduct that allegedly took place during a period of time spanning January 17, 2016, through December 31, 2016.

{¶ 3} One week after the indictment was filed, appellant appeared before the trial court for arraignment, at which time he entered a plea of not guilty to all charges contained in the indictment.  Thereafter, the matter proceeded through discovery and motion practice, culminating in a three-day jury trial that commenced on February 10, 2020.  At trial, the state and appellant each called three witnesses, and appellant elected to take the stand in his own defense.

{¶ 4} As its first witness, the state called A.K.  A.K. testified that she was born in January 2003, making her 17 years old at the time of trial.  When she was 12 years old, A.K. moved into her grandfather's house, where she lived with appellant.

2.

{¶ 5} When asked whether anything uncomfortable ever happened to her while living with appellant, A.K. responded in the affirmative and proceeded to describe several incidents of sexual abuse. Specifically, A.K. testified that appellant would take her into a recreation room in the home and engage in sexual acts with her. A.K. went on to state: "And he took - he never - at this point whenever he first started it, he didn't insert like his penis in me, but he took this nose inhaler thing and would rub it against my vagina." A.K. went on to indicate that appellant penetrated the folds of her vagina with the inhaler, and that this occurred "two or three times" at her grandfather's house. A.K. testified that she felt "stuck" and that she could not refuse appellant, or else he would get upset.

{¶ 6} As A.K. continued her testimony, she described a barn that she called "Sam's barn[1]," which housed animals. A.K. testified that she helped appellant care for the animals inside Sam's barn. On one occasion while she was assisting with the animals, appellant took A.K. into a nearby camper and engaged in sexual acts with her. Specifically, A.K. testified that, on one occasion, appellant pulled down her pants and licked her vagina. Further, A.K. stated that appellant "would take out his penis and * * * he would rub it up and down my private part." A.K. testified that appellant's penis penetrated the folds of her vagina. When asked if these sexual acts happened on more than one occasion, A.K. responded that this occurred "multiple times."

---

[1] Subsequent testimony revealed that this barn was located near a business called Sam's Deli.

3.

{¶ 7} Turning to a subsequent incident that occurred after she moved from her grandfather's house, A.K. recounted that appellant asked her if she wanted to "play," which she understood to be a reference to sexual acts from her prior interactions involving appellant. A.K. agreed, and took her pants off. Appellant proceeded to insert a vibrator into A.K.'s vagina. According to A.K., appellant then pulled down his pants and engaged in intercourse with her. A.K. went on to state that appellant had intercourse with her on two occasions, and further stated that he would masturbate, including rubbing his penis in and around the folds of her vagina, "every night or every day that he got the chance that [A.K.] and [appellant] were alone."

{¶ 8} As its second witness, the state called Dr. Randall Schlievert. Upon certification as an expert in the field of child abuse and neglect, Schlievert indicated that half of all child sexual abuse cases involve the kind of delayed disclosure of such abuse that occurred in this case. He then went on to describe several common reasons for the delay in disclosing sexual abuse, including manipulation on the part of the abuser, and explained that child victims are sometimes dependent upon their abusers and thus remain in contact with such persons after the abuse. On cross-examination, Schlievert acknowledged that he was not asked by the state to examine A.K., and thus he was unable to speak to any of the particulars of this case.

{¶ 9} For its third and final witness, the state called A.K.'s mother, S.B. S.B. stated that she and her children (including A.K.) moved from Tennessee to Toledo in October 2013, when A.K. was ten years old. Initially, S.B. and her children moved in

4.

with S.B.'s sister. However, one month after she moved to Toledo, S.B. began to live with her father on Parkwood Avenue in Toledo. Shortly thereafter, appellant also moved in with S.B.'s father.

{¶ 10} According to S.B., she worked at Sam's Deli in Toledo for a short period while she was on welfare. S.B. identified the barn and camper that were referenced by A.K. during her testimony, and noted that the barn and camper were located down the street from Sam's Deli.

{¶ 11} As S.B. continued her testimony, she acknowledged that she struggled with drug abuse issues at the end of 2013 and the beginning of 2014. She testified that she and appellant abused Percocet together. Eventually, in May or June 2014, S.B., appellant, and S.B.'s children moved out of S.B.'s father's home and into an apartment on Chase Street in Toledo. Thereafter, S.B.'s drug abuse worsened, as did appellant's.

{¶ 12} When asked if she ever suspected that appellant was sexually abusing A.K., S.B. stated: "There was one incident where he was always [locking] the door with her in it, and every time I try to come home and open the bedroom door, [it] was always locked." S.B. further described in incident in which she "opened the door and it looked like her head come flying out of the covers really fast. I could kind of tell that he was a little nervous and I just kind of like, I didn't know what to say." Thereafter, A.K. began reporting information about the sexual abuse to S.B. in a piecemeal fashion, which led S.B. to set up a meeting with Toledo Police Department detective Diane Trevino in December 2018. A.K. set forth her allegations of sexual abuse at this meeting, leading

5.

Trevino to launch an investigation that culminated in the referral of the matter to the state for eventual prosecution.

{¶ 13} At the conclusion of S.B.'s testimony, the state rested. Appellant then moved for an acquittal under Crim.R. 29, which was denied by the trial court. Thereafter, the matter proceeded to appellant's case-in-chief.

{¶ 14} As his first witness, appellant called Detective Trevino to the stand. Trevino testified that she met with S.B. and A.K. in December 2018, at which time she interviewed S.B. and A.K. separately. According to Trevino, A.K. alleged that she was sexually abused by appellant at her Chase Street address, but failed to disclose any incidents of sexual abuse at her grandfather's house or at the camper located near Sam's Deli. Trevino also interviewed appellant in January 2019. During the interview, appellant told Trevino that A.K.'s sexual abuse claims were fabricated in retaliation for his decision to stop paying her mobile phone bill.

{¶ 15} On cross-examination, Trevino noted that A.K. was living at the Chase Street address at the time of her interview. Additionally, Trevino testified that, in her experience, it is common for child sex abuse victims to reveal facts regarding their abuse over time, little by little. Ultimately, Trevino conceded that the testimony previously provided by A.K. was consistent with the statements A.K. made during her interview with Trevino in December 2018.

{¶ 16} For his second witness, appellant called A.K.'s grandfather's husband, J.M. J.M. testified that A.K., her mother, and her siblings moved into his Parkwood Avenue

6.

home in August 2013, followed three months later by appellant. The family resided in J.M.'s home until June 2014. While they resided in J.M.'s home, appellant and S.B. slept in the garage, which was converted into a recreation room. The children, including A.K., slept in another bedroom.

{¶ 17} At some point, S.B.'s relationship with her father and J.M. deteriorated to the point where the family was asked to leave the home. Appellant eventually moved back into J.M.'s home after separating from S.B. in 2018. Thereafter, in early November 2018, A.K. asked to stay the night with appellant at J.M.'s residence. J.M. testified that he denied A.K.'s request, because he thought it would be inappropriate to have her stay in the home with three men.

{¶ 18} After J.M. finished his testimony, appellant called A.K.'s grandfather, T.M. T.M. corroborated J.M.'s testimony, and further stated his belief that it would not have been possible for appellant to have sexually abused A.K. in his home, because "at any given time there was either myself or my husband or both of us in that household at all times."

{¶ 19} As his final witness, appellant took the stand. Appellant testified that he took care of A.K. during lengthy periods of time in which S.B. was absent from the home due to drug abuse. However, appellant stated that he moved out of the Chase Street home and into J.M.'s home in 2018, because he "got tired of [S.B.'s] drug use and her cheating on [him] on a regular basis."

7.

{¶ 20} Appellant was asked to describe his relationship with A.K., to which he responded that he occasionally fought with her over school-related issues. Appellant characterized his relationship with A.K. as a "normal father, daughter relationship." Throughout his testimony, appellant denied that anything sexual ever took place between him and A.K. When asked why he believed A.K. would make sexual abuse allegations against him, appellant posited that A.K. was upset that he had filed for divorce from S.B. and refused to continue paying her mobile phone bill.

{¶ 21} On direct examination, appellant revealed that he had filed a complaint for divorce from S.B., but had not yet obtained the divorce because "I missed both my court dates since I have been in jail * * *." This comment prompted the state to seek a sidebar conference, at which the state voiced its concern over appellant revealing the fact that he was incarcerated. The state argued that this comment constituted invited error, and appellant's defense counsel agreed. Ultimately, the trial court offered to provide the jury with a limiting instruction, but defense counsel rejected the offer, electing instead to "leave it alone."

{¶ 22} At the close of appellant's case-in-chief, defense counsel reasserted his Crim.R. 29 motion for acquittal, which was denied by the trial court. The trial court then instructed the jury, the parties provided their closing arguments, and the jury began its deliberations. During deliberations, the jury wrote a note to the trial court, asking whether it was permissible for them to access the internet from their mobile phones for the purpose of ascertaining the definition of the word "access," a term that appears in the

8.

elements of the charge of corrupting another with drugs that was contained in the indictment. The court responded in the negative, but the jury subsequently notified the court that one of the jurors had already researched the meaning of "access."

{¶ 23} Upon receiving this information and sharing it with the parties, the court informed appellant that

> this alone would serve as a foundation for you to ask for a mistrial, which would, if granted, mean the Jury is discharged and your case would start over with a new trial. An alternative to that is to bring the Jury out, find out exactly what this, in their words, unauthorized research dealt with, and it may or may not be viewed as impactful and you may make the considered decision that you're comfortable going forward with this Jury deliberating. That said, both you and the State would have the ability to request that I grant a mistrial.

The court went on to verify that appellant had an opportunity to confer with defense counsel on this issue.

{¶ 24} Initially, defense counsel argued in favor of a mistrial. In response, the state requested a voir dire of the jury to ascertain the extent of the issue. The court then proceeded to bring the jury into the courtroom for questioning. The foreperson revealed that the jury could not agree on the definition of access pertaining to Count 7 (corrupting another with drugs), and that they collectively decided to find a definition of that word on the internet. The court then questioned each juror individually (in the presence of the rest

9.

of the jury) to ensure that no further research was performed. The court admonished the jury for violating its instructions, noting that their research "was highly improper." Thereafter, the court ordered the jury to return to the jury room, and resumed its discussions with the parties.

{¶ 25} At this point, the state offered to dismiss the charge of corrupting another with drugs in order to "correct the taint" brought about by the jury's independent research. Following a private discussion with appellant as to his options in light of the state's offer and the jury's explanation of what occurred during deliberations, defense counsel informed the court:

> Against my counsel and advice, I advised my client that a mistrial is warranted simply because of the taintedness of more than one Juror as a result of the collective request for the definition as to "access." But, my client, Your Honor, does not want a mistrial. So, against my counsel and advice, my client wants to proceed with this trial, with the continued deliberations with the current Jury panel of twelve. He does though make a request that based upon the obvious * * * violation of this Court's instruction as to having electronic media, that Count 7 is tainted. We would ask the court to dismiss that count due to what the Jury has represented to the Court. But my client is not asking for a mistrial as to Counts 1 through 6.

10.

{¶ 26} The court then questioned appellant as to his wishes, and appellant confirmed that defense counsel accurately indicated his desire not to seek a mistrial and to have Count 7 dismissed. The state agreed to dismiss Count 7, and the trial court allowed the jury to continue deliberating after dismissing the charge of corrupting another with drugs.

{¶ 27} Ultimately, the jury returned with a verdict of guilty on four counts of rape, two of which related to incidents that occurred at T.M.'s home when A.K. was under the age of 13, and two of which related to incidents that occurred at the Chase Street apartment after she turned 13. The jury was unable to reach a unanimous verdict as to the remaining rape counts, which related to the sexual conduct that allegedly occurred inside the camper adjacent to Sam's barn. Thereafter, the trial court continued the matter for sentencing.

{¶ 28} At sentencing, the state asked the trial court to dismiss Count 7 and the two rape counts on which the jury could not reach a unanimous verdict. The court agreed, and dismissed those charges without prejudice. Thereafter, the court ordered appellant to serve ten years to life as to each of the two counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), and ten years as to each of the other two counts of rape in violation of R.C. 2907.02(A)(2) and (B), all to be served consecutively, for a total sentence of 40 years to life. Appellant's timely notice of appeal followed.

11.

## B. Assignments of Error

**{¶ 29}** On appeal, appellant assigns the following errors for our review:

I. The Trial Court abused its discretion in failing to order a mistrial as a Result of juror misconduct.

II. Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III. The evidence presented at trial was insufficient to support any of the convictions.

IV. The Jury's finding of guilty was against the manifest weight of the evidence.

## II. Analysis

### A. Juror Misconduct

**{¶ 30}** In his first assignment of error, appellant argues that the trial court abused its discretion when it failed to declare a mistrial as a result of juror misconduct based around the jury's outside research of the term "access" during deliberations.

**{¶ 31}** "An accused is entitled to a trial before an impartial, unprejudiced, and unbiased jury." *State v. Daniels*, 92 Ohio App.3d 473, 486, 636 N.E.2d 336 (1st Dist.1993). Thus, we have stated that "a jury's verdict must be based solely on the evidence and argument presented in open court, not on any outside influence." *State v. Hall*, 6th Dist. Sandusky No. S-08-018, 2009-Ohio-5728, ¶ 57, citing *Patterson v.*

*Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907), and *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 32} Ordinarily, we review the trial court's disposition of a defendant's allegation of juror misconduct for an abuse of discretion. *Id.* at ¶ 59, citing *State v. Keith*, 79 Ohio St.3d 514, 528, 684 N.E.2d 47 (1997). However, in this case, we need not determine whether the trial court abused its discretion in failing to declare a mistrial, because we find that any error associated with such inaction was invited by appellant.

{¶ 33} "Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Bitter v. Missig*, 72 Ohio St.3d 249, 254, 648 N.E.2d 1355 (1955). "'Under this principle, a party cannot complain of any action taken or ruling made by the court in accordance with that party's own suggestion or request.'" *Daimler/Chrysler Truck Fin. v. Kimball*, 2d Dist. Champaign No. 2007-CA-07, 2007-Ohio-6678, ¶ 40, quoting 5 Ohio Jurisprudence 3d (1999, Supp.2007) 170-171, Appellate Review, Section 448.

{¶ 34} Here, the trial court sua sponte raised the possibility of a mistrial based upon the jury's improper independent research during deliberations. In conjunction with its voir dire of the jury aimed at ascertaining the extent of the misconduct, the trial court asked appellant how he wished to proceed, and provided him with a range of alternatives to choose from, including a mistrial. Appellant then conferred with his defense counsel, who advised him to seek a mistrial. Against the advice of his counsel, appellant elected to proceed to a verdict on the rape counts and accepted the state's offer to dismiss the

13.

charge of corrupting another with drugs, which was the only charge related to the jury's independent research.

{¶ 35} In light of the facts of this case, it is clear that the trial court's failure to declare a mistrial was based upon appellant's own request. Therefore, any error associated with the trial court's failure to declare a mistrial was invited by appellant, and appellant cannot now complain of such error on appeal.

{¶ 36} Accordingly, appellant's first assignment of error is not well-taken.

## B. Ineffective Assistance of Counsel

{¶ 37} In his second assignment of error, appellant argues that he received ineffective assistance of trial counsel.

{¶ 38} To demonstrate ineffective assistance of counsel, appellant must first show that trial counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because "effective assistance" may involve different approaches or strategies, our scrutiny of trial counsel's performance "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Should appellant demonstrate her trial counsel's performance was defective, appellant must also demonstrate that prejudice resulted. *Bradley* at paragraph two of the syllabus.

14.

{¶ 39} Here, appellant's ineffective assistance argument is premised upon counsel's decision not to have the trial court provide a limiting instruction after he made a passing reference to the fact that he was in jail during the pendency of the divorce proceedings involving S.B. As noted above in our recitation of the facts, the trial court offered to provide the jury with a limiting instruction, but defense counsel rejected the offer, electing instead to "leave it alone" so that the issue would not be reiterated and emphasized a second time to the jury.

{¶ 40} "Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel." *State v. Hester*, 10th Dist. Franklin No. 02AP-401, 2002-Ohio-6966, ¶ 10, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). In *Hester*, the Tenth District rejected an argument that trial counsel was ineffective for failing to request a limiting instruction relating to the jury's consideration of the defendant's prior convictions, and explained that "[c]ounsel may have declined to request a limiting instruction regarding appellant's prior convictions out of concern that, if such an instruction were given, the prior convictions would be once again called to the jury's attention." *Id.* at ¶ 15.

{¶ 41} Our review of the record in this case confirms that a similar desire, namely wanting not to draw attention to appellant's passing reference to his incarceration, motivated appellant's trial counsel to reject a limiting instruction. This tactical decision, which was reasonable in light of the circumstances, does not give rise to a claim of ineffective assistance of trial counsel. Moreover, appellant does not establish how he was

15.

prejudiced by trial counsel's decision not to seek a limiting instruction. There is nothing in the record that would support the notion that the jury was influenced by appellant's admission that he was in jail during the pendency of his divorce proceedings.

{¶ 42} Because appellant has failed to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness, and in light of the fact that appellant does not explain how he was prejudiced by counsel's failure to request a limiting instruction, we find no merit to appellant's ineffective assistance argument. Accordingly, appellant's second assignment of error is not well-taken.

### C. Sufficiency of the Evidence

{¶ 43} In his third assignment of error, appellant contends that his rape convictions were not supported by sufficient evidence.

{¶ 44} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 45} In this case, appellant was convicted of two counts of rape in violation of R.C. 2907.02(A)(1)(b) and two counts of rape in violation of R.C. 2907.02(A)(2). R.C. 2907.02 provides, in relevant part:

> (A)(1) No person shall engage in sexual conduct with another who is
> not the spouse of the offender or who is the spouse of the offender but is

living separate and apart from the offender, when any of the following

applies:

* * *

(b) The other person is less than thirteen years of age, whether or not

the offender knows the age of the other person.

* * *

(2) No person shall engage in sexual conduct with another when the

offender purposely compels the other person to submit by force or threat of

force.

{¶ 46} At trial, the state introduced evidence by way of A.K.'s testimony to prove the four counts of rape for which appellant was convicted. With respect to the two counts of rape in violation of R.C. 2907.02(A)(1)(b), A.K. testified that appellant, on more than one occasion, took her into the recreation room at T.M.'s home and inserted his inhaler into her vagina. This testimony is sufficient to establish the "sexual conduct" element of R.C. 2907.02(A)(1)(b), as "sexual conduct" is defined under R.C. 2907.01(A) to include "the insertion, however slight, of * * * any instrument, apparatus, or other object into the vaginal or anal opening of another."

{¶ 47} As to how old A.K. was at the time appellant engaged in the foregoing sexual conduct with her, S.B. testified that the family moved into T.M.'s home in late-2013, and subsequently moved into the Chase Street apartment in May or June 2014. Therefore, the sexual conduct occurred prior to June 2014. A.K., who was born in

17.

January 2003, would have been 11 years old at this time. Thus the state's evidence was sufficient to prove that A.K. was under the age of 13 when appellant engaged in sexual conduct with her at T.M.'s home, as required under R.C. 2907.02(A)(1)(b).

{¶ 48} The two remaining rape counts under R.C. 2907.02(A)(2) were based upon incidents that occurred after the family moved into the Chase Street apartment, and after A.K.'s thirteenth birthday. In support of these charges, the state elicited testimony from A.K., who recounted two occasions in which appellant forced her to have intercourse with him. A.K. described the incidents in detail, indicating that appellant placed a towel underneath her, had her undress, inserted a vibrator into her vagina, and then engaged in intercourse with her. A.K. specified that this occurred on two occasions, and she further testified that appellant routinely rubbed his penis in and around the folds of her vagina as he masturbated.

{¶ 49} As to the force element under R.C. 2907.02(A)(2), the Ohio Supreme Court has indicated:

> The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.

18.

*State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus.  In *Eskridge*, the court went on to recognize that coercion is inherent in the parent-child relationship and stated that "force need not be overt and physically brutal, but can be subtle and psychological."  *Id.* at 58-59.  The relaxed standard regarding the force element that was espoused by the court in *Eskridge* has been deemed applicable to stepparents of a minor, such as appellant in this case.  *State v. Riffle*, 110 Ohio App.3d 554, 561, 674 N.E.2d 1214 (9th Dist.1996).

{¶ 50} Notably, appellant does not assert that the state's evidence was insufficient on the force element.  During her testimony, A.K. explained that appellant's demands for sexual conduct made her feel "stuck."  She elaborated that appellant would get upset if she refused his sexual advances, and therefore she elected to simply comply.  This testimony is sufficient to establish that appellant exerted psychological force over A.K., his 13-year-old stepdaughter, prior to engaging in sexual conduct with her.

{¶ 51} In advancing his sufficiency argument, appellant does not challenge the *existence* of the state's evidence as to each of the elements of the offenses for which he was convicted.  Rather, appellant points to A.K.'s delayed disclosure of abuse, S.B.'s failure to take action in response to such disclosures, and T.M.'s testimony that he never observed any indicators of sexual abuse to support his assertion that A.K. was lying when she accused him of raping her.  In essence, appellant challenges the *credibility* of the rape allegations made by A.K.  However, in reviewing whether the state's evidence is

19.

sufficient to support appellant's convictions, "[w]e neither weigh the evidence nor consider the credibility of the witnesses." *State v. Frost*, 6th Dist. Sandusky No. S-19-040, 2021-Ohio-457, ¶ 22, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Therefore, we find appellant's credibility arguments misplaced in this context.

{¶ 52} Having examined the evidence introduced by the state at trial, and upon viewing it in a light most favorable to the state, we find that a rational trier of fact could have found the essential elements of the rape offenses for which appellant was convicted proven beyond a reasonable doubt. Accordingly, we hold that the state's evidence was sufficient to support appellant's convictions, and we find appellant's third assignment of error not well-taken.

### D. Manifest Weight of the Evidence

{¶ 53} In his fourth assignment of error, appellant argues that the jury's guilty verdict was against the manifest weight of the evidence.

{¶ 54} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

20.

We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 55} In support of his contention that his convictions are against the manifest weight of the evidence introduced by the state at trial, appellant adopts the same arguments he raised in his third assignment of error. Appellant contends that A.K.'s accusations of rape were belied by her delayed disclosure of abuse, the lack of detail she provided as to the timeline of the incidents of rape, S.B.'s failure to take care of A.K.'s medical needs, and T.M.'s testimony that he never witnessed appellant sexually abuse A.K.

{¶ 56} Given the lack of any witnesses to the alleged sexual abuse in this case, we are presented with a "classic 'he said, she said' credibility contest" between A.K. and appellant. *State v. Foust*, 2d Dist. Montgomery No. Civ.A. 20470, 2005-Ohio-440, ¶ 15. A.K.'s testimony is the exclusive source in the record where we learn of the details surrounding the various incidents of alleged sexual conduct between her and appellant. In response to such testimony, appellant took the stand and testified that he never engaged in sexual conduct with A.K., and further posited that she was fabricating these allegations in response to his refusal to pay for her mobile phone and his filing of a complaint for divorce from S.B.

{¶ 57} In *Foust*, the Second District evaluated a manifest weight argument that was raised by the defendant in a similar he said, she said situation. There, the court recognized that the factfinder had the opportunity to observe the witnesses as they

21.

testified, and was thus reluctant to invoke its discretionary power to overturn the conviction on manifest weight grounds. *Id*. at ¶ 26-27. The court noted that a defendant who wishes to have his convictions overturned as against the manifest weight of the evidence

> must show that his conviction is contrary to the weight of the evidence offered, not merely that the probative value of the evidence offered by both sides is in equipoise. In that circumstance, this court will not substitute its judgment for that of the trier of facts on issues such as witness credibility, unless it is patently apparent that the trier of facts lost its way in arriving at its verdict.

*Id.* at ¶ 28.

{¶ 58} The credibility issues raised by appellant relating to alleged inconsistencies in the state's evidence were fully explored by appellant's defense counsel at trial. Many of these alleged inconsistencies were resolved upon further inquiry from the state. For example, A.K.'s delayed disclosure of the sexual abuse, which was the primary avenue of attack for appellant at trial, was explained by Dr. Schlievert as normal for children who experience sexual abuse at the hands of a parent. Further, the state vigorously cross-examined T.M. as to whether it was possible that sexual conduct could have occurred between appellant and A.K. in his home without his knowledge. Ultimately, T.M. was forced to acknowledge that he could not be in every room of the home at all times.

22.

{¶ 59} In sum, the jury considered the credibility issues raised by appellant as it evaluated the evidence presented by both parties at trial. Upon consideration, the jury chose to believe A.K.'s testimony and reject appellant's testimony. On review of that decision, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed. Accordingly, appellant's convictions are not against the manifest weight of the evidence, and we find his fourth assignment of error not well-taken.

### III.  Conclusion

{¶ 60} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE


_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.